UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex. rel.* ANDREW T. POOL; and ANDREW T. POOL, individually; | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | 2:09-cv-66-WTL-WGH |
| NMC, INC., d/b/a NORTHSIDE MACHINE CO., | ) ) ) | |
| Defendant. | ) | |
| | | |
| UNITED STATES OF AMERICA, | ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| NMC, INC., d/b/a NORTHSIDE MACHINE CO., | ) ) ) | 2:11-mc-2-JMS-WGH |
| Defendant, | ) ) | |
| DAMIEN SPLEETERS, | ) ) | |
| Intervenor. | ) | |

**JOINT ENTRY ON MOTION TO INTERVENE
AND MOTIONS TO RELEASE DOCUMENTS**

This matter is before the Court on Damien Spleeters's Motion to Intervene in *United States v. NMC, Inc.*, Cause No. 2:11-mc-2-JMS-WGH, and on NMC's Motions to Release Documents, filed in both the above-captioned causes. The motions have been fully briefed, and the Court, having considered

the parties' submissions and relevant law, and being duly advised, **DENIES** Spleeters's Motion to Intervene and **GRANTS** NMC's Motions to Release Documents.

I.      **Background**

As of February of 2009, NMC manufactured weapon parts and components and supplied them to the federal government. (QT[1] Dkt. 102 at ¶¶ 9–16). NMC sold some parts and components directly to the government subject to contracts with the Defense Logistics Agency. (*Id.* at ¶¶ 14–16). It sold other parts and components to FN Manufacturing, LLC ("FN"), which then sold them to the government subject to its own contracts. (*Id.* at ¶¶ 11–13). From November of 2005 until July of 2007, NMC employed Andrew Pool to inspect the quality of the parts and components it manufactured and sold. (*Id.* at ¶¶ 22, 45).

In February of 2009, Pool sued NMC. (QT Dkt. 1). Pool alleged that his supervisors at NMC instructed him to document—on paperwork NMC then submitted to its customers—that parts and components conformed to certain standards even though NMC lacked the capacity to test them. (*Id.* at ¶¶ 32–35). Pool further alleged that his supervisors instructed him to document that parts and components conformed to standards when his tests had revealed they did not. (*Id.* at ¶¶ 36–39). Finally, Pool explained that FN spot-tested

---

[1] This Entry addresses three motions arising out of two separately-filed actions. The Magistrate Judge will distinguish between "the *Qui Tam* Action" (Cause No. 2:09-cv-66-WTL-WGH) and "the Subpoena Enforcement Action" (Cause No. 2:11-mc-2-JMS-WGH) and will denote references to their dockets with the initials "QT" and "SE," respectively

parts it received from NMC and sent back those that did not conform to standards as NMC represented. (*Id.* at ¶ 40). According to Pool, his superiors would sell the returned parts and components to the government or resell them later to FN with falsified quality assurance documents. (*Id.* at ¶¶ 41–42). Ultimately, Pool's suit charged NMC with knowingly defrauding the government, firing him for challenging NMC's fraudulent practices, and then preventing him from obtaining employment elsewhere. (*Id.* at ¶¶ 47–64).

Pool brought his suit under the False Claims Act, which imposes civil penalties against entities that make false claims for payment from the government. *See* 31 U.S.C. § 3729. As in other *qui tam* actions, the False Claims Act allows private citizens to initiate litigation in the government's name and recover a share of any penalty imposed. 31 U.S.C. § 3730(b)–(d). Thereafter, the government may either join in and prosecute the action or allow the plaintiff to proceed on her own. 31 U.S.C. § 3730(c). On March 10, 2010, the government notified NMC and the Court that it would not join the *Qui Tam* Action. (QT Dkt. 26).

Although the government declined to enter Pool's *Qui Tam* Action, it continued its own investigation into NMC's dealings with FN. (SE Dkt. 2 at 2). On March 10, 2010, the Office of the Inspector General of the Department of Defense served a subpoena *duces tecum* upon NMC requesting original documents relevant to its transactions with FN. (SE Dkt. 3-1). NMC did not dispute the documents' relevance or the Inspector's authority to subpoena them. (SE Dkt. 3-4). In fact, NMC produced copies of all the documents

3

requested and offered to either allow the Inspector to review the originals at its attorneys' offices or to surrender the originals subject to a specific return date. (SE Dkt. 7 at 1). However, the documents remained evidence in Pool's then-ongoing *Qui Tam* Action, so NMC refused to hand over the originals indefinitely. (SE Dkt. 3-4). On March 10, 2011, the government moved this Court to enforce the Inspector's subpoena and compel NMC to produce the original documents without any constraint. (SE Dkt. 1). The Clerk docketed this motion as a distinct, miscellaneous action, the sole purpose of which was to determine whether—and under what conditions—NMC had to produce the original documents in response to the Inspector's subpoena. (*See id.*).

On May 5, 2011, the Court granted the government's motion in part and denied it in part. (SE Dkt. 12). Recognizing the parties' apparent agreements that the documents were relevant and that the subpoena was authorized, the Court ordered NMC to produce the originals. (*Id.* at 3–4). However, the Court also agreed that compelling unbounded production in the midst of the *Qui Tam* Action would work a hardship against NMC. (*Id.* at 4). Therefore, it ordered NMC to produce the original documents in the Clerk's office, either in Evansville or in Indianapolis. (*Id.*). The Court's order entitled both parties to access the originals in the Clerk's office and under the supervision of the Clerk's staff. (*Id.*). It also established a procedure by which either party could remove documents for testing. (*Id.*).

On April 29, 2011, NMC produced the original documents in the Clerk's office in Indianapolis and filed notice that it had complied with the Court's

4

April 21 order. (SE Dkt. 14; SE Dkt. 15). The Clerk's office issued a receipt acknowledging NMC's deposit and restating the conditions under which the documents could be accessed. (SE Dkt. 16). In May, the government removed documents for imaging and promptly returned them. (SE Dkt. 17; SE Dkt. 19; SE Dkt. 20; SE Dkt. 21). Thereafter, neither party took significant action in the Subpoena Enforcement Action until Spleeters filed his Motion to Intervene.

In early March of 2012, Pool and NMC entered a settlement agreement in the *Qui Tam* Action, and the Court dismissed the matter subject to their stipulation and with the government's consent. (QT Dkt. 123; QT Dkt. 125; QT Dkt. 127). No party filed additional motions concerning the documents deposited in the Clerk's office or made any effort to collect them. In November of 2013, Spleeters, a freelance journalist, contacted the Court seeking to inspect the original documents NMC had deposited in the Subpoena Enforcement Action. The Court ordered the parties to show cause why the Court should not grant Spleeters access to the documents or, in the alternative, to seek permission to remove the documents. (QT Dkt. 129; SE Dkt. 25). On November 22, Spleeters filed his motion to intervene (SE Dkt. 27), and, on November 26, NMC moved the Court to release the documents (QT Dkt. 130; SE Dkt. 29). On December 20, the government responded in opposition to Spleeters's motion and indicated agreement that the original documents should be returned to NMC. (SE Dkt. 35 at 2).

## II. Discussion

Spleeters seeks to intervene in the Subpoena Enforcement Action under Federal Rule of Civil Procedure 24(b) and on the basis of common law and First Amendment rights to access public documents. (SE Dkt. 27). In *Bond v. Utreras*, the Seventh Circuit recently—and exhaustively—examined both the requirements for Rule 24(b) permissive intervention and the extent of the rights to access court records and discovery materials. *See* 585 F.3d 1061 (7th Cir. 2009). The Court finds that *Bond* controls Spleeters's motion and that Spleeters lacks standing to intervene in this matter.

### A. To intervene under Rule 24(b), a person must demonstrate standing by articulating an invasion of a legally protected interest.

First and foremost, a prospective intervenor must demonstrate standing to intervene under Rule 24(b)—especially in a closed case. *Bond*, 585 F.3d at 1072. Of course, Article III of the Constitution empowers federal courts to hear only active cases and controversies. *Id.* at 1068–69. Courts have been lenient in demanding demonstration of standing to intervene in active cases, where the original parties will litigate their controversy anyway and the intervenor is merely "'along for the ride.'" *Id.* at 1069–71 (quoting *Bethune Plaza Inc. v. Lumpkin*, 863 F.2d 525, 531 (7th Cir. 1988)). Where the parties already have resolved their disputes, however, intervention would reopen the litigation. *Id.* at 1071–72. A prospective intervenor therefore must articulate a case or controversy that would satisfy Article III's standing requirements. *Id.*

6

To satisfy Article III, a case or controversy must include an injury capable of resolution by the court. *Id.* at 1072. A prospective intervenor must allege an invasion of a legally protected interest. *Id.* at 1073. As on a motion to dismiss under Rule 12(b)(6), a prospective intervenor need not prove the merits of her cause. *See id.* She must, however, articulate an interest that the law protects against wrongful invasion, and she must allege how that interest has been invaded. *See id.*

### B. Neither the press nor the general public has a legally protected interest in accessing unfiled discovery materials.

Although the law grants journalists and the general public rights to access public documents and court files, neither journalists nor the general public have a legally protected interest in accessing <u>unfiled</u> discovery materials. *Id.* at 1073–76. Rights to access public documents are rooted in the common law and the First Amendment. *Id.* at 1073. However, these rights extend only to "traditionally publicly available sources of information." *Id.* at 1074 (citing *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33 (1984)). The common law has never treated unfiled discovery materials as traditionally public. *Id.* (citing *Gannett Co., Inc. v. DePasquale*, 443 U.S. 368, 389 (1979)). Neither has the First Amendment, which only implicates the parties' rights to disclose their own unfiled materials. *See id.* at 1077 (citing *Seattle Times Co.*, 467 U.S. at 32, 34). Additionally, the Federal Rules of Civil Procedure have codified the rule that parties will conduct discovery in private and that discovery materials will become public only when filed with the court. *See* Fed. R. Civ. P. 5(d)(1) ("discovery requests and responses <u>must not be filed</u> until they are used in the

7

proceeding or the court orders filing") (emphasis added). *See also* Fed. R. Civ. P. 26(a); *Bond*, 585 F.3d at 1074–76.

A party files documents only by submitting them for the court's consideration and use in resolving the dispute before it. *Bond*, 585 F.3d at 1075. A document is not filed with the court simply because it is relevant to the litigation or because it is the subject of a discovery request. "That the court's discovery processes and rules are used to require litigants to produce otherwise private information to an opposing party is not enough to alter the rights of the general public." *Bond*, 585 F.3d at 1075.[2] A document is filed with the court for public access purposes when, for example, a litigant attaches it as an exhibit to a pleading under Rule 9, a summary judgment motion under Rule 56, or a reply opposing a motion to compel under Rule 37. In these circumstances, litigants furnish the court with documents and ask the court to consider them in resolving a conflict. In the course of ordinary, undisputed discovery, the court never reviews, considers, or even encounters the documents.

### C. Because the documents Spleeters seeks were never filed with the Court, Spleeters lacks standing to intervene.

Spleeters has not articulated an invasion of a legally protected interest and therefore has failed to raise a case or controversy that would give him

---

[2] The inventory of precedents (from both the Seventh Circuit and the Supreme Court) addressing permissive intervention and the rights to access traditionally public documents is richer than the Magistrate Judge has projected by repeatedly citing *Bond*. By relying so heavily on this single precedent, the Magistrate intends to emphasize *Bond*'s recent and comprehensive analysis of these issues its applicability to this case.

8

standing to intervene in this matter. Spleeters seeks to intervene only to access the documents NMC produced in response to the Inspector's subpoena. These documents never were filed with the Court, making them unfiled discovery materials beyond the scope of the common law and First Amendment rights to access public documents.

NMC did not <u>file</u> the documents in support of its position in the Subpoena Enforcement Action (*see* SE Dkt. 7); it <u>produced</u> the documents subject to the Court's order (*see* SE Dkt. 15). Neither the government nor NMC presented any of the documents in question for the Court's review. In fact, the Court never reviewed the documents at all. NMC submitted the documents directly to the Clerk's office, where they were reviewed only by the government. The Court certainly never reviewed the documents for purposes of resolving the Subpoena Enforcement Action. The entirety of the conflict was whether and under what parameters the government must be allowed to access the original documents. By the time the documents were produced, no conflict was pending before the Court: Their production resolved the dispute.

The Court's determination that the documents were relevant to the government's investigation does not mean—as Spleeters suggests—that the documents "influenced or underpinned" its ruling in the Subpoena Enforcement Action. (*See* SE Dkt. 32 at 3). Relevance alone does not place documents within the scope of the right to access public documents. All evidence must be relevant to be discoverable at all. Fed. R. Civ. P. 26(b)(1). Consequently, to draw the line between accessible and inaccessible discovery

materials at relevance would be to erase the line and hold that <u>all</u> discovery materials are publicly accessible. Such a position cannot be squared with the Seventh Circuit's plain statement that only <u>some</u> discovery materials—those filed with the court—are publicly accessible. *Bond*, 585 F.3d at 1073–76.

Moreover, neither the documents nor their relevance underpinned or influenced the Court's disposition of the Subpoena Enforcement Action. The Court never reviewed the documents, and neither party ever described their contents to the Court. Indeed, neither the contents nor the relevance of the documents ever came into question. NMC conceded that they were relevant and offered to produce them. (*See* SE Dkt. 3-4; SE Dkt. 7 at 1). The sole dispute before the Court was under what conditions the government could review the originals. (SE Dkt. 7 at 1). That the documents were the subject of the Subpoena Enforcement Action does not mean the documents themselves had any influence over the dispute's resolution.

The Court also must reject Spleeters's argument that the documents were "filed with the Court" because NMC "delivered" them to the Clerk's office and the Clerk's office issued a receipt. (*See* SE Dkt. 32 at 4). True, Rule 5(d)(2)(A) states that a paper is filed with the court when it is delivered to the clerk. Yet, common sense dictates that delivery alone cannot always constitute filing. All sorts of papers—including law journals, phone directories, holiday cards, and an assortment of mail—are <u>delivered</u> to the Clerk's office every day, but very few of those papers are <u>filed</u>. What common sense alone leaves unsettled has been resolved by the Seventh Circuit's unambiguous statement

10

that a document is not "filed" for public access purposes until it is presented to the Court to influence the outcome of a dispute. *Bond*, 585 F.3d at 1075. Again, the documents Spleeters seeks never were presented to anyone outside the Clerk's office. They never were viewed by the Court, and—had they been—there was no dispute to resolve upon their consideration.[3]

Finally, the Court declines to accept Spleeters's argument that subtle factual differences render *Bond* inapplicable to this case. (*See* SE Dkt. 32 at 3–4). The *Bond* Court articulated a narrow holding that specifically addressed intervention to challenge a protective order in a closed case. *Bond*, 585 F.3d at 1072. However, the rules of law set forth in *Bond* translate to Spleeters's motion.

That the Subpoena Enforcement Action formally remained open on the docket does not remove it from *Bond's* reach. Although the Seventh Circuit explicitly limited its holding in *Bond* to interventions into closed cases, *id.*, it made clear that the case's status on the docket sheet is not dispositive. Indeed, the journalist in *Bond* moved to intervene before the district court had accepted the parties' settlement agreement and dismissed the case. *Id.* at 1066. What was important to the Seventh Circuit was that nothing was left to

---

[3] Of course, the parties have filed <u>some</u> documents with the Court in the course of litigating both the *Qui Tam* Action and the Subpoena Enforcement Action. (*E.g.*, SE Dkt. 3-2 (letter to NMC's counsel filed as exhibit to motion to compel)). However, the Court takes no position on whether Spleeters has a right to access those documents. The Court reads Spleeters's motions as seeking only to access the original documents that were the subject of the Inspector's subpoena. Likewise, the parties have addressed only those documents in their briefs. Therefore, to the extent Spleeters has any interest in obtaining documents filed with the Court in either action, he must seek them through another, appropriately focused motion.

11

be litigated after the parties settled the matter. Because the district court had no case or controversy left to resolve, it could not allow the journalist to intervene unless he could articulate one. *Id.* at 1071–72.

For purposes of *Bond*, both the *Qui Tam* Action and the Subpoena Enforcement Action had been closed for at least 20 months by the time Spleeters sought to intervene. The *Qui Tam* Action was settled and formally closed more than a year before Spleeters filed his motion. The Subpoena Enforcement Action was resolved when NMC complied with the Court's order by producing the originals and remained open on the docket only because neither of the parties retrieved the documents; nothing had been litigated in the 30 months immediately preceding Spleeters's motion. As in *Bond*, there was no active case or controversy, and Spleeters has failed to articulate one.

That the *Bond* intervenor was challenging a protective order also is inconsequential to Spleeters's motion. The protective order was merely the object of the journalist's intervention. The Seventh Circuit grounded its Article III analysis in "the established general principle . . . that 'an actual controversy must be extant at all stages of review,'" suggesting it would require a prospective intervenor to establish standing in a closed case even without a protective order in place. *Id.* at 1071–72 (quoting *Arizonans for Official English*, 520 U.S. 43, 67 (1997)). Likewise, the presence of a protective order played no role in the Seventh Circuit's finding that the journalist had not articulated a redressable injury. The Court of Appeals found that the journalist lacked standing because no source of law protects a right to access unfiled discovery

12

materials, *id.* at 1074–77, not because he was challenging a protective order. The protective order was strictly the vehicle by which the journalist raised his request. To the extent the protective order influenced the Seventh Circuit's analysis or disposition *Bond*, the Magistrate Judge perceives that the Court of Appeals would have applied the same rationale and reached the same result on Spleeters's motion.

In sum, Spleeters has not grounded his motion in an enforceable right to access the documents he seeks and therefore has failed to demonstrate an active case or controversy that would give him standing to intervene. The Magistrate sympathizes with Spleeters's position. Myriad precedents have emphasized that courts and their records are open to the public. *See id.* at 1073–74 (collecting cases). Among the foundations underlying the rights to access traditionally public court documents is the notion that the truth often is better ascertained through journalistic and public investigation than through litigation alone. *See, e.g., Grove Fresh Distribs., Inc. v. Everfresh Juice Co.*, 24 F.3d 893, 897 (7th Cir. 1994) (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)). If Pool's allegations are true, inquiry into NMC's conduct is important to the public. If Pool's allegations are not grounded in fact, public inquiry also may be important to vindicate NMC's reputation. With the *Qui Tam* Action settled and the government apparently declining to prosecute NMC, there is little chance for the public to learn either truth without access to the documents Spleeters seeks. Nevertheless, the Court can only grant remedies

13

authorized by the Constitution, and the Constitution authorizes no remedy for Spleeters.

## III. Conclusion

For the foregoing reasons, the Court **DENIES** Spleeters's Motion to Intervene. Consequently, the Court also must **DENY** Spleeters's Motion for Access to Records and Documents (SE Dkt. 27-1) as moot. There being no conflict to resolve with the documents, and there being no dispute as to their ownership, the Court **GRANTS** NMC's Motions to Release Documents and **ORDERS** NMC to retrieve the documents from the Clerk's office within 14 days of the issuance of this Entry.

**SO ORDERED.**

Date: 1/14/2014

_____
William G. Hussmann, Jr.
United States Magistrate Judge
Southern District of Indiana